UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| MARCO AURELIO ROQUE SAMPAIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-0655 (BAH) |
| | ) | |
| INTER-AMERICAN DEVELOPMENT BANK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on defendant's motion to dismiss and plaintiff's motion for appointment of counsel. For the reasons discussed below, defendant's motion will be granted, and plaintiff's motion will be denied as moot.

I. BACKGROUND

Plaintiff began working for the Inter-American Development Bank ("IADB") in June 2005, and at that time he had an Employment Authorization Card. Compl. at 2-3; *see id.*, Ex. 4 (Employment Authorization Card valid from April 25, 2005 through April 24, 2006).[1] He obtained a G4 visa on March 16, 2006, *id.* at 3, and on that same date commenced the first of four employment contracts, each a Research Fellow position, with the IADB.[2] *Id.*, Ex. 8A

---

[1] Plaintiff has filed an Amended Complaint [Dkt. #5] and several notices to the court [Dkt. #11, 19-22]. The basic facts are fully set forth in his original Complaint [Dkt. #1] and the attached exhibits.

[2] An International Organization (G) visa is issued to a diplomat and other government official for travel to the United States to take up an appointment at a designated international organization. *See* http://travel.state.gov/visa/temp/types/types_2638.html.

1

(Letter of Agreement dated March 2, 2006). This action arose from the third contract with the IADB's Office of Evaluation and Oversight ("OVE Agreement") for the period from November 1, 2006 through January 31, 2007, *id.*, Ex. 8C (Letter of Agreement dated October 27, 2006), and the fourth contract with the Modernization of State and Civil Society Programs Division 2 ("RE2/SC2 Agreement") for the period from February 20, 2007 through December 31, 2007, *id.*, Ex. 8D (Letter of Agreement dated February 23, 2007). The IADB's codes, policies and procedures governed these contracts, Compl. at 4, and among these guidelines were the Norms for Research Fellows, *id.* at 5, assigning responsibility to "the incumbent to obtain the necessary visa or work permits required by the authorities of the country(ies) in which the services will be performed for the [IADB]." *Id.*, Ex. 11 (Interim Norms for Contractual Research Fellows) at 5-6.[3] The contract terms provided that the IADB could terminate the contract at any time for any reason, as long as it provided 14 days' notice. *Id.*, Ex. 8C at 2 & Ex. 8D at 3.[4]

---

[3] Both the OVE and the RE2/SC2 Agreements contained the following language:

> During the term of this Agreement, you will be subject to the [IADB's] codes, policies, rules and procedures applicable to the Research Fellowship Program in effect at the time you are appointed and as they may be amended during your assignment.

Compl., Ex. 8C at 2 & Ex. 8D at 3.

[4] Both the OVE and the RE2/SC2 Agreements contained the following language:

> The [IADB] shall have the right to terminate this Agreement for any reason, at any time prior to the expiration of its term, or prior to completion of the work hereunder by giving you fourteen (14) calendar days advance written notice. The [IADB] may terminate this Agreement without advance notice if you are found blameworthy of misconduct. In the event of termination, the [IADB] will make equitable payment to you, within thirty (30) days from the date of termination, for services satisfactorily performed to the date of termination . . . . Equitable payment upon termination shall not exceed the total compensation otherwise payable to you under this Agreement and shall take into account all

Plaintiff's last day of work at the IADB was March 30, 2007. Compl. at 6; *see id.*, Ex. 16 (Letter to plaintiff from Jorge Sapoznikow dated April 3, 2007). On April 3, 2007, the IADB notified plaintiff in writing of its intention to terminate the RE2/SC2 Agreement effective April 18, 2007. *Id*. at 7; *see id.*, Ex. 16. In a memorandum to the IADB's Ethics Committee, the reasons for the termination were described as follows:

> In the wake of the [RE2/SC2 Agreement, plaintiff] proceeded to request the renewal of his G4 visa from Mr. Adalberto Bellagamba of [the Benefits and Payments Section of the Human Resources Department]. That action was not coordinated with the officer in charge of contracting at RE2/SC2, Ms. Claudia Valderrama, which is why she asked [plaintiff] for a copy of the visa form. In the course of that process, both Mr. Bellagamba and Ms. Valderrama realized that [plaintiff] had presented a form requesting a visa with a validity date beyond the date of expiration of his current contract . . . . In addition, it was determined that under his previous contract, [the OVE Agreement], specifically for his contract from 1 November 2006 to 31 January 2007, [plaintiff] had sought a G4 visa with an expiration date of 20 April 2007.

Compl., Ex. 18 (Memorandum to Maria Borrero, Ethics Officer, Ethics Committee, from Robert J. Deal, Jr., Chief, Benefits and Payments Section, Human Resources Department, dated April 17, 2007).[5] "[G]iven that [plaintiff] could present himself as a candidate for hiring in other units," Mr. Deal submitted the matter to the Ethics Committee for its "consideration, so as to

---

> payments made to you under this Agreement prior to the date of termination hereof.

Compl., Ex. 8C at 3 & 8D at 3.

[5] The five-member Ethics Committee "is responsible for interpreting, implementing and enforcing the Code of Ethics of the [IADB]." Compl., Ex. 34 (Procedures for the Ethics Committee of the Inter-American Development Bank) at 1 (Sec. 100, 102.a). It receives allegations of Code of Ethics violations and is authorized to "obtain the information needed to determine whether the Code has been violated through hearings or investigations by the [Office of Institutional Integrity] or other appropriate mechanisms." *Id.*, Ex. 34 at 2 (Sec. 103.a.3). If a Code provision has been violated, the Committee may "impose an administrative sanction, prescribe remedial action, or recommend disciplinary action to the Vice President for Finance and Administration [VPF]." *Id.*, Ex. 34 at 3 (Sec. 103.a.5).

determine whether there was a violation of the [IADB's] Code of Ethics and, if appropriate, to include [related documents] in [plaintiff's] file." *Id.*, Ex. 18. Through its Secretary, the Ethics Committee notified plaintiff of its receipt of "an allegation stating that [he had] falsified [his] G4 visa applications on two occasions," and that it had "requested an investigation on this matter from the Department of Institutional Integrity (OII)."[6] Compl., Ex. 24 (Letter to plaintiff from Maria Borrero, Secretary, Ethics Committee, dated July 3, 2007).[7]

The OII's findings of fact included the following:

> 13. On February 20, 2007, [plaintiff] was hired as a Research Fellow by RE2/SC2. The expiration date of this contract . . . was December 31, 2007.
>
> 14. On March 16, 2007, almost a month after signing the RE2/SC2 contract, [plaintiff] completed a second application for a G-IV visa. In this application [plaintiff] falsely wrote that the estimated date of completion of his employment was July 31, 2008.

---

[6] The OII conducts investigations on the Ethics Committee's behalf. *See* Compl., Ex. 34 at 7 (Sec. 301.6.a). The OII's final report, which "include[s] findings of fact as well as a copy of all supporting evidence on which such findings are based (collectively, the 'Final Investigation Report'), shall be submitted to the Committee before it conducts any hearings on an [a]llegation, and before it makes a final decision in respect of an [a]llegation." *Id.*, Ex. 34 at 7-8 (Sec. 301.6.b).

[7] According to the OII's findings, on October 17, 2006, plaintiff accepted a temporary position for the period from October 23, 2006 through February 28, 2007, and signed this OVE Agreement on October 31, 2006. Compl., Ex. 25 ¶¶ 6, 8. When plaintiff submitted his visa application to the United States Department of State on October 19, 2006, he indicated that the estimated contract completion date was April 30, 2007, even though agreement had not been signed, *id.*, Ex. 25 ¶ 7, "because he was convinced that this then-unsigned contract with OVE would expire on that date, *id.*, Ex. 25 ¶ 9. The Department of State issued an extension of plaintiff's G4 visa through April 30, 2007. *Id.*, Ex. 45 at 6. The OVE Agreement actually was in effect from November 1, 2006 through January 31, 2007. *Id.*, Ex. 25 ¶ 8. The OII found that plaintiff's misrepresentation of the completion date of the OVE Agreement violated the Code of Ethics. *Id.*, Ex. 25 ¶ 23. Plaintiff attributes the error to a "malicious trick" on the part of OVE staff, prompting him to apply for a visa on the assumption that his contract would have ended on April 30, 2007, and purposely "cut[ting] the contract shorter so that [he] would be accused of requesting a visa with a date longer than the contract end date[] of 31 January 2007." Pl.'s Opp'n at 11; *see id.* at 13-15.

15. Instead of following standard procedure by submitting the visa application to Contract and Budget Assistant Claudia Valderrama . . . for revision and the subsequent approval by the Division Chief, [plaintiff] personally delivered it to Benefits and Visas Officer Bellagamaba . . . .

16. When Valderrama learned that [plaintiff] had bypassed his Division Chief and had sent his visa application directly to the visa officer, she requested that [plaintiff] provide her with a copy of the application. [Plaintiff], however, never complied with the request.

17. Valderrama then requested a copy of [plaintiff]'s visa application from Bellagamba. Valderrama informed Bellagamba about the false information contained in [plaintiff's] application regarding the termination of his RE2/SC2 contract . . . .

18. Bellagama immediately telephoned [plaintiff]. Using the speaker function, because Valderrama also was present at the time, Bellagamba asked [plaintiff] to clarify whether he had another contract with the [IADB] because . . . according to [IADB] records, [plaintiff's] contract was due to expire on December 31, 2007, and [plaintiff's] visa application indicated his contract was not due to expire until July 31, 2008. [Plaintiff] falsely informed Bellagamba that he did, in fact, have another contract . . . .

19. Bellagamba requested that [plaintiff] provide him with a copy of the contract allegedly expiring in July 2008. [Plaintiff] agreed to do so the next day. Bellagamba informed OII that instead of complying, [plaintiff] went to Bellagamba's office that same day and asked to change the information in his visa application. Bellagamba had to deny the request because he had already submitted the visa application to the Department of State.

19.[8] When interviewed, [plaintiff] told OII that he simply made a mistake when filling out his visa application. He stated that he was probably just confused about the date because he was planning to return to Brazil on July 31, 2008.

20. Based on the false information provided by [plaintiff], the Department of State provided [him] a G-IV visa valid for one year until March 15, 2008, stating that the consulting contract expired on July 31, 2008.

---

8   Two paragraphs had been designated "19" in error. *See* Compl., Ex. 25 at 4.

Compl., Ex. 25 (Final Report of Investigation) ¶¶ 13-20 (references to attachments omitted); *see also id.*, Ex. 29B (Memorandum to Jorge Sapoznikow from Claudia Valderrama dated March 28, 2007). Based on this information, the OII concluded that there was "sufficient evidence to demonstrate that [plaintiff] violated the [IADB's] Code of Ethics on . . . March 16, 2007, when he knowingly provided false information on his G-IV application[]." *Id.*, Ex. 25 ¶ 22. Plaintiff "knew that he had signed a contract with (RE2/SC2) only until December 31, 2007, as evidenced by his efforts to bypass the [IADB's] visa-application review process," and he "lied to the Benefits and Visas Officer when [he] stated that he had another contract . . . that expired on July 31, 2008." *Id.*, Ex. 25 ¶ 24.

The Ethics Committee held a hearing on September 18, 1997, Compl. at 15-16, during which plaintiff testified that the visa application submitted for the RE2/SC2 Agreement contained an incorrect date in error. [9] *Id.*, Ex. 32 (Memorandum to Carlos Hurtado, Vice President, Finance and Administration, from Alicia Ritchie, Chair, Ethics Committee, dated October 26, 2007) at 1. The Committee did not find plaintiff's explanation credible, due in part to his "familiar[ity] with the [IADB's] Visa office . . . process and procedures." *Id.*, Ex. 32 at 1-2. It stated:

> The areas of the Code of Ethics violated by [plaintiff] include: (1) not providing truthful information; (2) intentional misrepresentation of information; and, (3) violation of the Core Value of Integrity.
>
> Based on these violations . . . the Ethics Committee recommends that [plaintiff] be barred from [IADB] employment for a period of two years beginning [on October 26, 2007].

---

[9] "A hearing before the [Ethics] Committee . . . shall be held to offer the employee under view an opportunity to respond to an [a]llegation before the Committee makes a final decision." Compl., Ex. 34 at 8 (Sec. 301.7a). The employee may present evidence including witness testimony and affidavits. *Id.*, Ex. 34 at 8 (Sec. 301.7c).

*Id.*, Ex. 32 at 2. The recommendation was accepted by the Vice President for Finance and Administration ("VPF"), *id.*, Ex. 35 (email to Maria Borrero dated December 20, 2007), and plaintiff was notified in writing of the Ethics Committee's decision, *id.*, Ex. 36 (Letter to plaintiff from Maria Borrero dated February 29, 2008).

Plaintiff appealed to the IADB's Conciliation Committee, Compl. at 19; *see id.*, Ex. 37-38 (Complaint Presentation Forms) & Ex. 42 (Letter to plaintiff from Luis M. Bauza, Secretary, Conciliation Committee, dated July 7, 2008).[10] The Conciliation Committee findings were as follows:

> A. WITH RESPECT TO THE TERMINATION OF YOUR CONTRACT. The Committee found that your challenge regarding the termination of the contract had expired 120 calendar days from the date you were notified of its termination . . . . Therefore, the Committee will (i) not review the merits of the events leading to the termination of your contract nor (ii) consider your request for the suspension of the contested action . . . .
>
> B. WITH RESPECT TO THE 2-YEAR SUSPENSION DECISION BY THE ADMINISTRATION. This challenge was timely presented and the Committee reviewed it, but found no violation of due process (i) in the actions of the Ethics and Conduct Review Committee or (ii) in the acceptance of its recommendation by the [VPF].
>
> Based on the afore[]mentioned reasons, the Conciliation Committee finds no merit in continuing with the claim and discharges itself of its responsibility in the Case.

---

[10]  The Conciliation Committee "hear[s] claims brought by individually and directly affected employees with respect to any alleged non-observance of the contract of employment, the terms and conditions of appointment, the [IADB's] Administrative and Personnel Policies, or, in general, any claim related to a decision taken by the Administration which directly affects the individual employee." Compl., Ex. 44 (PE-326 Staff Rule No. 326 Conciliation Committee) at 1 (Sec. 101). Former IADB employees must "initiate . . . procedures to obtain the administrative remedies" available through the Conciliation Committee "within one hundred and twenty (120) calendar days from the date on which they terminated their services with the [IADB]." *Id.*, Ex. 44 at 1 (Sec. 201a).

Compl., Ex. 43 (Letter to plaintiff from Luis M. Bauza dated July 16, 2008). Plaintiff availed himself of an opportunity to seek relief with the IADB's Administrative Tribunal, *id.*, Ex. 43, a body charged with "hear[ing] and pass[ing] judgment upon any application by which a staff member . . . alleges non-observance of his contract of employment or terms and conditions of appointment," *id.*, Ex. 46 (Statute of the Administrative Tribunal of the Inter-American Development Bank) art. 2 § 1. He challenged the termination of the RE2/SC2 Agreement and the two-year bar on future employment with the IADB. *See id.* at 22. The Tribunal heard oral argument on October 29, 2009, *id.*, Ex. 45 (Judgment Case No. 70) at 1, and largely vindicated plaintiff by overturning the two-year bar on employment and by awarding compensation:

> The Tribunal orders:
>
> The annulment of the decision of the VPF of 20 December 2007.
>
> The removal from [plaintiff's] Personnel File of all documents related to his G-IV visa renewal applications.
>
> The [IADB] to pay [plaintiff] the sum of US $79,015.68 as compensation for moral injury to his reputation and to his prospects of new employment. This amount is determined on the basis of the two years [plaintiff] was barred form [sic] employment at the [IADB].

*Id.*, Ex. 45 at 11.

In this action, plaintiff accuses the IADB of "abusing its power, br[eaking] its regulations in order to deny basic employment rights, . . . conceal[ing] evidence in order to obstruct Justice, [and] . . . delay[ing] and thwart[ing]" plaintiff's efforts to use the IADB's internal grievance process. Compl. at 1. His claims are directly related to his former employment with the IADB and arise from the termination of the RE2/SC2 Agreement. Plaintiff demands damages as compensation for violation of his right to due process, defamation, employment discrimination based on age, invasion of privacy, and intentional infliction of emotional distress. *Id.* at 27-28.

8

## II. DISCUSSION

### A. *Dismissal for Lack of Subject Matter Jurisdiction*

The IADB moves to dismiss the complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that this Court lacks subject matter jurisdiction over plaintiff's claims. Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem.") at 13. Specifically, defendant argues that it is an international organization which is absolutely immune from suit for any claims arising from an employment relationship. *See generally id.* at 14-19. Because the Court lacks subject matter jurisdiction over plaintiff's claims, the Court will dismiss the complaint on this basis and will not address defendant's alternative arguments for dismissal.

### B. *Immunity Under the International Organizations Immunities Act*

For purposes of the International Organizations Immunities Act ("IOIA"), *see* 22 U.S.C. §§ 288-288k, the term "international organization" means "a public international organization in which the United States participates pursuant to any treaty . . . and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided" in the IOIA. 22 U.S.C. § 288. Established in 1959, the IADB is an international organization the purpose of which is to "contribute to the acceleration of the process of economic development of the member countries, individually and collectively." Agreement Establishing the Inter-American Development Bank art. 1§ 1, Apr. 8, 1959, 10 U.S.T. 3029. The President has designated the IADB an international organization, *see* Exec. Order No. 10,873, 25 Fed. Reg. 3097 (Apr. 8, 1960); Exec. Order No. 11,019, 27 Fed. Reg. 4145 (Apr. 27, 1962), and it therefore enjoys the broad privileges and immunities conferred under the IOIA. *See* 22 U.S.C. § 283g ("The provisions of . . . article XI, sections 2 to 9, . . . of

9

the agreement shall have full force and effect in the United States.").[11] It "enjoy[s] the same immunity from suit and every form of judicial process as is enjoyed by foreign governments,

---

[11] In relevant part, Article XI (Status, Immunities and Privileges) of the IADB charter states:

> Section 1. *Scope of Article*
> To enable the [IADB] to fulfill its purpose and the functions with which it is entrusted, the status, immunities, and privileges set forth in this article shall be to the [IADB] in the territories of each member.
>
> Section 2. *Legal Status*
> The [IADB] shall possess juridical personality and, in particular, full capacity:
> a) to contract;
> b) to acquire and dispose of immovable and movable property; and
> c) to institute legal proceedings.
>
> Section 3. *Judicial Proceedings*
> Actions may be brought against the [IADB] only in a court of competent jurisdiction in the territories of a member in which the [IADB] has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.
> No action shall be brought against the [IADB] by members or persons acting for or deriving claims from members. However, member countries shall have recourse to such special procedures to settle controversies between the [IADB] and its members as may be prescribed in this Agreement, in the by-laws and regulations of the [IADB] or in contracts entered into with the [IADB].
> Property and assets of the [IADB] shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the [IADB].
>
> * * *
>
> Section 10. *Implementation*
> Each member, in accordance with its juridical system, shall take such action as is necessary to make effective in its own territories the principles set forth in this article, and shall inform the Bank of the action which it has taken on the matter.

Agreement Establishing the Inter-American Development Bank art. XI1, Apr. 8, 1959, 10 U.S.T. 3029.

except to the extent that such [an] organization[] may expressly waive [its] immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b). The IADB, then, is absolutely immune from suit with two exceptions: if the IADB expressly waives its immunity, or if the President of the United States withholds the IADB's immunity. *See* 22 U.S.C. §§ 288, 288a(b); *see also Mendaro v. World Bank*, 717 F.2d 619, 613-14 (D.C. Cir. 1983). The President of the United States has not withheld immunity, leaving only one basis for this Court's jurisdiction over plaintiff's claims – an express waiver by the IADB itself.

The IADB has waived immunity to suits to the extent necessary to further its objectives. *See Mendaro*, 717 F.2d at 618. For example, the IADB may be sued by a debtor to enforce a loan agreement, *see Lutcher S.A. Celose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454 (D.C. Cir. 1967), or for matters arising from "commercial transactions with the outside world" such as "*external* relations with its debtors and creditors." *Mendaro*, 717 F.2d at 618 (emphasis in original); *see also Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 282 (D.C. Cir. 2009) ("Allowing such claims [as unjust enrichment] would mitigate possible hesitancies by independent consultants to negotiating and entering into formal contracts with the IIC by providing reassurance that if their agreement or formal contract failed, for whatever reason, they would be fairly compensated for any benefit they have provided that the IIC has unjustly retained."), *reh'g en banc denied*, 583 F.3d 869 (D.C. Cir. 2009); *Osseiran v. Int'l Fin. Corp.*, 553 F.3d 836, 840-41 (D.C. Cir. 2009) (finding International Finance Corporation waived immunity from promissory estoppel and breach of confidentiality claims concerning alleged representations made during negotiations for sale of its investments to private parties).

Plaintiff attempts to avail himself of this limited waiver of immunity by characterizing his contractual relationship with the IADB as "participation in work . . . with the '*outside world*'

11

in a commercial setting." Pl.'s Opp'n at 35 (emphasis in original). He describes his project with the OVE as the "gathering of data, via computerized research and direct contact with officials in member countries, to compose the Country Evaluations, which are central to the [IADB's] function," *id.*, and required him to manage a partnership with a consulting firm. *Id.* Similarly, plaintiff describes his work with RE2/SC2 as work with the "outside world" to create a database and conduct research and data analysis pertaining to market conditions in member countries. *See id.* at 36. Both contracts, plaintiff argues, "involved work in the commercial-market-place related to financial activities of the [IADB]," and for both contracts "the visa was issued for [him] to carryout activities central to the [IADB's] chartered objective." *Id.* A further indication of contacts with the "outside world," plaintiff contends, is the requirement of a visa issued by the State Department, an "outside entity," which was required in order for plaintiff "to carryout [sic] activities central to the [IADB's] chartered objective." *Id.*

"One of the most important protections granted to international organizations is immunity from suits by employees of the organization in actions arising out of the employment relationship." *Mendaro*, 610 F.2d at 615. Such immunity "is rooted in the need to protect international organizations from unilateral control by a member nation over the activities of the international organization within its territory." *Id.* (citation omitted). For example, the District of Columbia Circuit "upheld the immunity of the Organization of American States from a suit brought by employees alleging breach of their employment contracts." *Id.* at 616 (citing *Broadbent v. Org. of Am. States*, 628 F.2d 27 (D.C. Cir. 1980)). It found that "[d]enial of immunity opens the door to divided decisions of the courts of different member states passing judgment on the rules, regulations, and decisions of international bodies," serving to "undercut[] uniformity in the application of staff rules or regulations" which "would undermine the ability of

the organization to function effectively." *Broadbent*, 628 F.2d at 35 (footnote omitted). Lawsuits arising from true commercial transactions "contrast sharply with the harassing interference noted in *Mendaro* of allowing a type of employee suit where an organization operates in many different countries." *Vila*, 570 F.3d at 282.

Plaintiff offers no argument or authority to establish that the IADB has waived immunity with respect to suits filed by employees, or that such suits further the IADB's purposes. Absent such a showing, the Court must find that it lacks subject matter jurisdiction over plaintiff's claims. *See Aguado v. Inter-Am. Dev. Bank*, 85 Fed. App'x 776, 777 (D.C. Cir. 2004) (per curiam) (finding that appellant failed to show that a lawsuit furthers the IADB's objectives so as to distinguish her claims from other employment disputes); *Dujardin v. Int'l Bank for Reconstr. & Dev.*, 9 Fed. App'x 19, 20 (D.C. Cir. 2001) (concluding that bank was immune under the IOIA from defamation suit); *Fazzari v. Inter-Am. Dev. Bank*, 254 F.3d 315, 315 (D.C. Cir. 2000) (per curiam) (finding that plaintiff's status as a retiree did not distinguish his claim from those that arise out of an employment relationship); *Broadbent*, 628 F.2d at 36 (finding that "the employment disputes between the appellants and OAS were disputes concerning the internal administrative staff of the Organization," and absent a waiver of immunity with respect to such "non-commercial activity," the appellant's action had to be dismissed"); *see also Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1336 (D.C. Cir. 1998) (affirming dismissal of declaratory judgment action against the IADB on the ground that it is absolutely immune under the IOIA from garnishment proceedings initiated in order to enforce Maryland court judgments for alimony and child support).

## III. CONCLUSION

Because the Court lacks subject matter jurisdiction, defendant's motion to dismiss will be granted. An Order accompanies this Memorandum Opinion.

DATE: August 31, 2011

/s/ *Beryl A. Howell*
BERYL A HOWELL
United States District Judge